**SIGNED this 12th day of September, 2007.**

_____
**ROBERT C. MCGUIRE**
**UNITED STATES BANKRUPTCY JUDGE**
_____

## UNITED STATES BANKRUPTCY COURT
### WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | CHAPTER 11 |
| LMP 8500 SHOAL CREEK, L.L.C., | § | |
| Debtor | § | CASE NO. 06-10161-RCM |
| | § | |
| | § | |
| LMP 8500 SHOAL CREEK, L.L.C., | § | |
| DEBTOR IN POSSESSION | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | ADVERSARY NO. 06-1081-RCM |
| | § | |
| 8500 SHOAL CREEK OWNERS | § | |
| ASSOCIATION, INC., TOM MCKAY, | § | |
| LLOYD MCCARLEY, AND | § | |
| CHRIS CANADA, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION

The parties to this proceeding are: the Plaintiff, LMP 8500 Shoal Creek, L.L.C.,

("Debtor" or "LMP"), and the Defendants, 8500 Shoal Creek Owners Association, Inc. (the

"Association"), and Tom McKay, Lloyd McCarley, and Chris Canada (the "Individual

Defendants").

## JURISDICTION

The court has jurisdiction over this proceeding under 28 U.S.C. § 1334.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (C), (O), and (K).

The foregoing and following constitute the court's findings of fact and conclusions of law pursuant to Fed.R.Bankr.P. 7052   To the extent not inconsistent herewith, the court also adopts and incorporates by reference its findings of facts and conclusions of law previously stated on the record during the course of the trial.  Where appropriate, a finding of fact shall be construed to be a conclusion of law, and vice versa.

## PROCEDURAL AND FACTUAL BACKGROUND

LMP and the Individual Defendants each own one commercial office building in a four-building commercial condominium complex (the "Property") governed by the Association.  The Debtor sued the Association and Individual Defendants in state court[1] for numerous violations of the Texas Property Code, breach of fiduciary duty, breach of contract (the Association's Declaration of Condominium Regime), tortious interference, and slander of title, and to void and/or subordinate a lien filed by the Association against LMP's interest in the Property.  LMP complained of the Defendants' conduct in adopting an amendment to the Association's Declaration of Condominium Regime that prohibited subdivision of individual buildings within the complex, their role in allegedly causing the property to be "Red-Tagged" by the City of Austin, and their filing of the lien on LMP's building (the "LMP Building").

In addition to monetary relief, LMP sought injunctive relief to compel the Defendants to immediately take official action to resolve the City of Austin's "Red Tag" that encumbered the LMP Building beginning in May of 2005.  However, on July 11, 2007, during argument in this

---

[1] On February 7, 2006, LMP filed its voluntary petition under 11 U.S.C. § 1101, *et seq.* and on March 9, 2006, the Defendants removed this suit to this court.

matter, it was announced that LMP's request for an injunction had been resolved because the City had removed the Red Tag.

The Individual Defendants filed a counterclaim against LMP for their attorneys fees and for damages allegedly resulting from LMP's destruction of parking areas and pathways at the condominium complex, alleging causes of action for trespass, tortious interference with prospective business relationships, breach of contract, conversion, and violations of the Texas Property Code (specifically, the Texas Condominium Act codified as Chapter 82 of the Property Code). The Individual Defendants later agreed to dismiss their cause of action for conversion. They also filed a third party complaint against Lucian Morehead, LMP's principal, which mirrored the claims asserted in their counterclaim. That third party complaint was subsequently dismissed from this action for lack of jurisdiction.

This court (the Hon. Larry E. Kelly presiding) granted partial summary judgment against the Association, finding it liable for violation of the Texas Condominium Act in connection with the adoption and recording of the challenged amendment to the Declaration. Judge Kelly did not rule on the question of damages from that violation.

At the close of LMP's evidence during the trial, the Defendants moved under Fed.R.Bankr.P. 7052, incorporating Fed.R.Civ.P. 52(c), for a judgment as a matter of law with respect to LMP's primary causes of action for breach of contract and damages for violation of the Texas Condominium Act, arguing that LMP had failed to prove that it suffered any quantified damages. That motion was granted, for the reasons stated on the record.

Following that ruling, the parties agreed that the Defendants would submit by motion and affidavit their claim for attorneys fees and costs of defending this lawsuit. In its responsive pleadings, LMP has disputed their right to any attorneys fees and challenged certain of the costs they claim.

The parties in their Joint Pre-Trial Order, at pp. 2-5, have given a detailed summary of the agreed facts, most of which are adopted by the court and incorporated hereinbelow.

## THE INVALID AMENDMENT

In 2001, the original developer of the Property, which is located at 8500 Shoal Creek Boulevard in Austin, Texas, obtained a "Site Development Determination" ("SDD," *see* Plaintiff's Exh. 137) from the City of Austin allowing for 307 total parking places on the Property. The 2001 SDD was never fully implemented by the original developer.

On or about October, 2002, the Association was created when its Declaration, Articles of Incorporation, and Bylaws were filed in the official real property records of Travis County by Radian Building Partnership, Ltd. (the "Declarant").

On or about November 4, 2002, and prior to the sale of any units at the Property, the Declarant adopted and recorded the "First Amendment to Declaration of Condominium Regime for 8500 Shoal Creek Office Condominiums" (the "First Amendment"). The Declaration (and any valid amendments), which incorporates the Texas Condominium Act, constitutes a binding contract between and among the individual unit owners.

On or about January 27, 2003, after Defendant Lloyd McCarley ("McCarley") had purchased Building 1, the Declarant unilaterally adopted and recorded the "Second Amendment to Declaration of Condominium Regime for 8500 Shoal Creek Office Condominiums" (the "Second Amendment"). In accordance with the Second Amendment, the current owners' allocated interests in the Association are as follows:

```
Building 1 (Defendant McCarley)      23.0%
Building 2 (Defendant Tom McKay)     12.3%
Building 3 (Defendant Chris Canada)  11.8%
Building 4 (LMP)                     52.9%
```

On or about May 19, 2003, after Defendants McCarley and Canada purchased their respective units, the Declarant adopted and recorded the "Third Amendment to Declaration of

Condominium Regime for 8500 Shoal Creek Office Condominiums" (the "1st Third Amendment"). The 1st Third Amendment sought to change the number of parking spaces allocated to Building 2 (the building later sold to Defendant Tom McKay ("McKay")) from 34 to 24, and to reserve the other ten parking spaces for reallocation among the other unit owners. Soon after the 1st Third Amendment was adopted, McKay purchased Building 2. (During the pendency of this lawsuit, McKay transferred his ownership in the Property to Kay Mac II, Ltd., which he owns and controls.)

Prior to LMP's purchase of its building, the Declarant (the then-current president of the Association) installed the 24 parking places on the north side of the building that LMP would later buy, in the manner approved and required by the City-approved 2001 SDD as well as Canada's purchase contract with the Declarant. The parties later learned that the Declarant had failed to complete the City-approved 2001 SDD by replacing impervious cover with pervious cover sufficient to offset the installation of the additional parking spaces.

From August 1999 until December 2004, the Kuperman, Orr, Rial and Albers law firm and its predecessors (collectively, "KORA") was the primary law firm for Lucian Morehead ("Morehead"), the founder of LMP, and then for LMP itself.

On July 7, 2004, with the assistance of KORA, Morehead formed LMP as the entity that would purchase and develop Building 4 of the Property (i.e., the LMP Building). LMP is managed by Lucian Morehead Properties, Ltd., the general partner of which is Lucian Morehead Properties GP, Inc., the president of which is Morehead.

On July 15, 2004, LMP purchased the LMP Building from David Buttross, II, who himself had purchased the LMP Building earlier that same day. To finance its purchase, LMP obtained a loan from David Buttross. This purchase money loan did not require any payments until August 15, 2005.

At the time of its purchase of the LMP Building, LMP planned to divide it into several smaller office condominiums and sell them separately. At that time, the Declaration allowed for subdivision of the each unit of the Property.

The four buildings and the common areas at 8500 Shoal Creek Boulevard are operated and controlled by the Association. The Association is a condominium association that comprises all of the individual unit owners of the Property pursuant to the Association's Declaration (and any valid amendments), By-Laws, and Articles of Incorporation and the Texas Condominium Act.

At all times since July 2004, the Individual Defendants have been members of the board of directors for the Association and have represented 75% of the votes.

On or about August 23, 2004, McCarley, Canada and McKay (the "Individual Defendants") either held a secret meeting or acted improperly without a meeting and each signed and executed the "2nd Third Amendment to Declaration of Condominium Regime for 8500 Shoal Creek Office Condominiums" (the "2nd Third Amendment"), and the Association adopted the 2nd Third Amendment on that date, without the vote of LMP. The Individual Defendants failed to provide LMP proper notice of the meeting and/or the vote prior to the adoption of the 2nd Third Amendment; however, the Defendants did not know that the 2nd Third Amendment was "illegal" or "invalid" prior to or at the time it was passed.

The 2nd Third Amendment purported to amend the Declaration as follows:

No Unit may be the subject of a future condominium process resulting in the separate ownership of separate portions of such Unit. No Unit my be divided or subdivided in any manner such that any fractions of the entire Unit are owned separately or by separate owners.

On or about August 25, 2004, the Association recorded the 2nd Third Amendment in the real property records of Travis County, Texas, along with several other documents. On or about November 1, 2004, the Association through Rick Albers recorded the 2nd Third Amendment for a

second time in the real property records of Travis County, Texas, for the purpose of ensuring notice to prospective purchasers.

KORA represented the Defendants from August 2004 through February 2005 in connection with their dealings with LMP regarding its business plan to sub-condo the LMP Building. KORA had a conflict of interest when it represented LMP and the Defendants on opposite sides of a dispute simultaneously.

On or about October 25, 2004, Rick Albers as the Defendants' counsel sent LMP a letter demanding that it "(i) immediately cease all activities towards subdividing Unit 4 by a condominium process, and (ii) cease all other activities that are inconsistent with the Valid Third [2nd Third] Amendment."

In approximately February 2005, Rick Albers withdrew from representation of the Defendants, stating in writing that he just discovered that his law firm also represented LMP on the opposite side of the very same dispute. *See* Association's Exh. 33, 2/7/05 email from Albers to McKay, Canada, McCarley, Morehead.

LMP made repeated demands on the Association and the Individual Defendants to withdraw the 2nd Third Amendment, and when they failed to do so LMP filed this lawsuit in Travis County District Court on or about March 18, 2005.

On or about April 6, 2005, the Association filed its Answer in this lawsuit, and stated therein:

> The Association will hereby acknowledge that "Amendment 3," as identified in Plaintiff's Original Petition . . . is invalid in that the Association did not comply with procedural requirements imposed upon it for the amendment of the Declaration of the Association. Until and unless a further amendment is enacted, the Association will respond to any inquiry of the Plaintiff and prospective contractual relations of the Plaintiff, with this position and will in due course take such steps as are necessary and proper to remove the Third Amendment from the records.

On or about May 4, 2005, each of the Individual Defendants signed a ballot rescinding the 2nd Third Amendment.  Not until approximately July 12, 2005, however, did the Defendants cause their rescission of the 2nd Third Amendment to be filed in the real property records of Travis County, Texas.  The court finds that the Defendants intentionally delayed in filing the rescission.

Section 82.067(a) of the Texas Condominium Act provides, in pertinent part:

Except as provided by Subsection (b), a declaration, including the plats and plans, may be amended only by vote or agreement of unit owners to which at least 67 percent of the votes in the association are allocated, or any larger majority the declaration specifies. A declaration may specify a smaller number only if all of the units are restricted exclusively to nonresidential use. An amendment to a declaration may be adopted:

(1) by written ballot that states the exact wording or substance of the amendment and that specifies the date by which a ballot must be received to be counted;

(2) at a meeting of the members of the association after written notice of the meeting has been delivered to an owner of each unit stating that a purpose of the meeting is to consider an amendment to the declaration; or

(3) by any method permitted by the declaration.

Further, § 82.067(e) of the Texas Condominium Act states, in relevant part:

Except as permitted or required by this chapter, an amendment may not create or increase special declarant rights, increase the number of units, change the boundaries of a unit, alter or destroy a unit or limited common element, change a unit's allocated interest, or change the use restriction on a unit unless the amendment is approved by 100 percent of the votes in the association.

Finally,  § 82.063 of the Texas Condominium Act states, in relevant part:

**Subdivision of Units**

(a) If the declaration expressly permits, a unit may be subdivided into two or more units. Subject to the declaration, on written application of a unit owner to subdivide a unit and after payment by the unit owner of the cost of preparing and recording amendments and plats, the association shall prepare, execute, and record an amendment to the declaration, including the plats and plans, subdividing the unit.

(b) The amendment to the declaration must be executed by the owner of the unit to be subdivided, assign an identifying number to each unit created, and reallocate the allocated interests formerly allocated to the subdivided unit to the new units in any reasonable manner prescribed by the owner of the subdivided unit.

As the court ruled on LMP's motion for partial summary judgment, the Association violated the Texas Condominium Act when it adopted the 2nd Third Amendment.

However, the court has also ruled (at the close of LMP's evidence at trial) that, although LMP alleged that the passage and recordation of the 2nd Third Amendment damaged it, it failed to prove with sufficient specificity that it suffered any quantified damages as a result of the 2nd Third Amendment. In particular, LMP failed to credibly prove that it lost any specific sales of units within its building, or that the value of its building decreased, or that it otherwise suffered quantified damages, as a result of the passage and recordation of the 2nd Third Amendment. Therefore, LMP's claims against the Defendants for damages for violations of the Texas Condominium Act, for breach of fiduciary duty, for breach of contract, for tortious interference, for slander of title, for conspiracy to commit common law fraud, and for statutory fraud, all based on their actions in connection with the 2nd Third Amendment, should be denied. LMP's claims for equitable subordination of the Association's and certain of the Individual Defendants' claims, based on their actions in connection with the 2nd Third Amendment and other matters, are discussed separately below.

## PARKING ISSUES AND PLAINTIFF'S REQUEST FOR INJUNCTIVE RELIEF

As described above, on February 16, 2001, the City issued an SDD approving and formally permitting the parking plan proposed by the initial developer of the Property. The SDD allowed for 307 total parking spaces. The 2001 SDD conformed to the then-existing City parking regulations, which required one parking space per every 300 square feet of office space. 2Because the Property contains approximately 92,000 square feet of office space, 307 spaces

were required at that time.  Since that time, however, City regulations have changed to require more parking spaces per square foot of office space.  Therefore, unless the 2001 SDD were implemented, more parking spaces would be required.

Chris Williamson, the Development Supervisor for the City, testified that the Property was initially "Red-Tagged" for not having any Site Development Determination, but that the City later determined that there was an approved plan, the 2001 SDD.  He testified that an SDD does not expire.  While the 2001 SDD does not accurately depict the site conditions as they currently exist at the Property, according to Mr. Williams' testimony, rather than voiding the old SDD, it would be easier to mark it up–it is generally simpler to complete a permit that a party already has.  Unused parking spaces could be used for pervious cover.

In particular, Mr. Williams testified (and the court finds his testimony credible) that the Red Tag issues existing on the Property as of the date of the beginning of the trial were relatively simple and could have been resolved within 48 hours or less, if the parties would have cooperated, but McKay wished to continue the battle and to implement a new SDD rather than resolve the issues under the 2001 SDD.  During the time the Red Tag was in place, the City would have accepted any reasonable alternative to the 2001 SDD to which the parties could agree, as a resolution to the Red Tag.  It is the court's opinion that any such resolution would have required the parties to negotiate in candor and good faith, which thus far they have been unable and/or unwilling to do.  The evidence showed in particular that LMP never submitted the 2001 SDD to the board of directors of the Association for a vote.  On the other hand, the Defendants could have acted jointly with LMP,[2] but did not act, to resolve the parking and

---

[2] Any action taken after June of 2005 by the Defendants without the consent of LMP would arguably have violated the Temporary Restraining Order entered by the Travis County District Court on the request of the Plaintiff, which prohibited the Defendants from "engaging in any further renovation, destruction or repair to the outside of [*sic*] its property."

pervious/impervious cover problems at the Property.  Out of frustration, in June of 2005 LMP, through Morehead, took it upon itself to dig up the parking lot to change impervious to pervious cover.  As members of the board of directors of the Association, the Individual Defendants voted to fill in those holes in the parking lot, but as of the date of the beginning of the trial, the Association had never taken any action to do so.[3]  The parties offered each other several alternative solutions to resolve the City's Red Tag, none of which was accepted by all of them as of the beginning of the trial.

However, regardless of whether the parties have acted in good faith, LMP failed at trial to prove that it suffered any quantified damages as a result of the Defendants' conduct, and so the court finds that its claims for damages for breach of fiduciary duty, for breach of contract, for tortious interference, based on the Defendants' actions in connection with the parking issues, should be denied.

LMP's claims for equitable subordination of the Association's and certain of the Individual Defendants' claims, based on their actions in connection with the parking and other issues, are discussed below.   As mentioned above, LMP's claim for injunctive relief with respect to the parking issues is now moot and will be denied as such.

**THE ASSESSMENT AND LIEN FOR THE ASSOCIATION'S ATTORNEYS FEES**

 In December of 2005, the Individual Defendants as members of the Association's board of directors voted for it to adopt a special assessment in the amount of $100,000 to hire the law firm of George & Brothers to defend it in this lawsuit and voted to assess that expense to the four

---

[3] As previously mentioned, the parties were ultimately able to resolve Red Tag issues after trial.

owners, including LMP, each in an amount equal to that owner's interest according to the

Declaration.[4]

Section 4.4 of the Declaration governing the Association provides:

Special Assessments.  In addition to the regular annual Assessments provided for
above, the Board may levy special Assessments whenever in the Board's opinion
such special Assessments are necessary to enable the Board to carry out the
mandatory functions of the Association under the Declaration.  The amount of
any special Assessments shall be at the reasonable discretion of the Board.

Paragraph 4.7 provides that all amounts so assessed automatically became a lien upon the unit(s)

covered by the assessment–in this case, LMP's portion became a lien upon its Property. The

initial paragraph of Article 4 provides in part that "[t]he Association may enforce payment of

such Assessments in accordance with the provisions of this Article and § 82.113 of the Uniform

Act [i.e., the Texas Condominium Act, codified as Chapter 82 of the Texas Property Code]."

Section 82.113(a) provides, in turn, that:

An assessment levied by the association against a unit or unit owner is a personal
obligation of the unit owner and is secured by a continuing lien on the unit and on
rents and insurance proceeds received by the unit owner and relating to the
owner's unit. In this section, "assessments" means regular and special
assessments, dues, fees, charges, interest, late fees, fines, collection costs,

---

[4] The evidence with respect to the amount of the Association's lien on LMP's Property is
not altogether clear.

As a starting point, the court notes that the Association filed a proof of claim in LMP's
bankruptcy case for, among other things, a secured claim of only $21,160 for an "unpaid special
assessment."  The court therefore assumes that secured claim to be the Association's attorneys
fees at issue here, in LMP's actions for equitable subordination of, and to void, the lien.

However, the Notice of the Assessment, Plaintiff's Exh. 98, shows that the total assessed
for attorneys fees was $100,000, but that only $40,000 of that was apparently owed at that time.
(Probably not coincidentally, 52% of $40,000 is $20,800, only $360 less than the amount
claimed in the Association's proof of claim.)  The Association's attorney later represented (at the
hearing on the form of the judgment to be entered in this adversary proceeding) that LMP's
current portion of the assessment, and therefore the current amount of the lien, was 52% (LMP's
percentage ownership) of $100,000, or $52,000.  LMP did not dispute that representation.
Therefore, and since the Motion for Recovery of Attorney's Fees filed herein documents that
much more than $100,000 has now been incurred by the Association, the court finds that the
Association's lien covers LMP's portion of all the attorneys fees assessed up to $100,000.  The
amount of the lien on LMP's interest that secures attorneys fees is therefore $52,000.

attorney's fees, and any other amount due to the association by the unit owner or levied against the unit by the association, all of which are enforceable as assessments under this section unless the declaration provides otherwise.

LMP argues that the Association's special assessment and lien "for attorneys fees that it expended to defend actions that it has admitted to be illegal and that this Court has determined to be illegal" should not be allowed, and that the "lien does not represent an expense for a common purpose and cannot otherwise be justified."

By its terms, the Declaration requires only that a special assessment be "necessary to enable the Board to carry out the mandatory functions of the Association under the Declaration." Such "mandatory functions" include enforcing the Declaration. *See* § 9.3 of the Declaration ("any Owner at his own expense, Declarant or the Board [of the Association] shall have the right to enforce any provision of the Declaration"). Moreover, "[t]he Association [has] the powers provided in § 82.102 of the Texas Condominium Act, which provides in relevant part that "[u]nless otherwise provided by the declaration, the association, acting through its board, may . . . institute, defend, intervene in, settle, or compromise litigation or administrative proceedings in its own name on behalf of itself or two or more unit owners on matters affecting the condominium . . .." Tex. Prop. Code § 82.102(a)(4) (2007).

Whether or not these litigation costs were "necessary" to the Association's mandatory functions is normally for its board of directors to decide. **Papalexiou v. Tower West Condominium**, 401 A.2d 280 (N.J. Super.Ch. 1979) (absent a demonstration of a condominium board's lack of good faith, self-dealing, dishonesty, or incompetency, its determination that an emergency existed requiring a special assessment should not be judicially reviewed); *see also* **Raymond v. Aquarius Condominium Owners Ass'n, Inc.**, 662 S.W.2d 82 (Tex.App.–Corpus Christi 1983) (the standard to be applied in reviewing an assessment by a condominium's governing body is reasonableness).

The court finds that a special assessment and lien to cover an owner's proportionate share of litigation costs, even if that litigation was successfully brought against the association sought to be charged by the unit owner, is proper under both the Texas Condominium Act and the Declaration of this Association. *See also* **Ocean Trail Unit Owners Ass'n, Inc. v. Mead**, 650 So.2d 4 (Fla. 1994) (condominium association can enforce special assessment imposed to pay judgments, attorney's fees, and costs incurred with lawsuit brought by unit owners against association in which association's purchase of real property was invalidated as unauthorized act and subsequently rescinded); *see also* **Washington Courte Condominium Association-Four v. Adreani**, 523 N.E.2d 1248 (Ill.App. 1 Dist.), *appeal denied,* 530 N.E.2d 266 (Ill. 1988) (expense of litigation to recover damages from developers of condominium for alleged serious construction defects is type of nonrecurring common expense which is properly subject of special assessment imposed on condominium owners). Both the claim of the Association for LMP's portion of the special assessment for the Association's attorneys fees, and the lien securing it, in the amount of $52,000, are therefore valid to the extent the attorneys fees are reasonable and sufficiently detailed, as discussed hereafter. The Association is entitled to enforce that lien to the extent provided by, and in accordance with, the Declaration and the Texas Condominium Act, and subject to the automatic stay imposed by the filing of LMP's bankruptcy case. The court has heretofore entered an order permitting the sale of LMP's property and that order provides for all valid liens to attach to the proceeds of the sale, which are to be escrowed pending further order of the court. The Judgment herein shall provide that the Association's lien shall be paid from those proceeds (to the extent available, considering the lien's priority) upon the later of the Plaintiff's receipt of the sales proceeds and the date the Judgment becomes final. That relief is without prejudice to the Association to request relief from the automatic stay to otherwise enforce the lien.

## THE INDIVIDUAL DEFENDANTS' COUNTERCLAIMS

Defendants McKay, McCarley and Canada jointly filed a Counterclaim in this suit.[5]  In it, they sought actual and exemplary damages in excess of $100,000 for trespass, tortious interference, breach of contract ( the documents governing the Association), conversion, and violation of the Texas Condominium Act, as a result of LMP's alleged actions in removing and destroying portions of the parking lot in the summer of 2005.  The Defendants later dismissed their cause of action for conversion.  The Individual Defendants also counterclaimed for their attorneys fees, which claim is discussed below.            `

While all three Individual Defendants filed the Counterclaim, McCarley presented no evidence that he was damaged at all and did not urge his counterclaim at trial, and the only evidence of any damage to McKay was his testimony that he spent approximately $500 for hazard cones he placed in the parking lot around the removed asphalt.  The court finds that he waived any such *de minimus* claim by failing to include any such relief in the proposed judgment the Defendants jointly submitted after trial.

---

[5] The Association filed no express counterclaim in this lawsuit.  However, as discussed in Footnote 4 above, it did file a proof of claim in LMP's bankruptcy case, for a total of "$49,347.36+."  It breaks that claim down as: (1) a secured claim for $21,160 for a "unpaid special assessment" (referring, the court assumes, to the Association's attorneys fees that were specially assessed, *see* Plaintiff's Exh. 98), plus (2) a secured claim for $8,187.36 for unpaid Association dues, plus (3) an unsecured claim for  "$20,000+" for "damages to the parking lot."

While the Association does not contend that it asserts a counterclaim in this suit (making no argument in its Motion for Recovery of Attorneys' Fees that it was entitled to such fees based on any counterclaim), and LMP has not filed any objection *per se* to the Association's proof of claim, the court finds that the claims included in the Association's proof of claim are at issue in this suit by virtue of LMP's request to invalidate the lien securing two of them, and to subordinate all of them.  Those causes of action to void the lien and to subordinate claims are discussed below.

With respect to the Association's claim for damages due to the parking lot destruction, however, the court finds that that claim should be disallowed in total, for three reasons.  First, there was no evidence at trial that the Association itself suffered any such damages.  Second, the claim is duplicative of Canada's claim.  Third, the Association failed to include in its proposed judgment any findings or conclusions, or any ruling, regarding any claim of the Association for such damages, as so should be held to have waived it.

Canada, on the other hand, offered substantial evidence and argument in support of his

counterclaim.  In particular, the evidence showed that during June of 2005, without obtaining the

permission of board of directors of the Association or of the Individual Defendants, LMP

removed pavement in certain areas of the parking lot adjacent to Canada's property.

Section 5.11 of the Declaration of the condominium regime for the Property provides:

> <u>Alteration or Removal of Improvements and Temporary Structures</u>.  No tent, shack, or other temporary building, improvement, or structure shall be placed upon any portion of the Regime; provided, however, that temporary structures necessary for storage of tools and equipment, and for office space for architects, builders, and foremen during actual construction may be maintained with the prior approval of the Board, approval to include the nature, size, duration, and location of such structure.  Any construction, other than normal maintenance, which in any way alters the exterior appearance of any Improvement, or the removal of any Improvement shall be performed only with the prior written approval of the Board.  All temporary structures shall be removed from the Regime within thirty (30) days after the completion of Improvements.  The Board will determine, in its sole discretion, the date of such completion.

Section 6.2(b) of the Declaration of the Declaration of the condominium regime for the Property

further provides:

> No owner shall have the right to take any action with respect to the exterior of the any Common Elements without first obtaining the written consent of the Board, which consent may be withheld if determined not in the best interests of the Regime.  Under no circumstances shall any Owner do any act nor allow any condition to exist which will adversely affect other Owners and their use of the Common Elements.

"Common Elements" are defined to mean "all portions of the Land other than the Units" and

therefore include the parking lot.

As discussed above, § 82.067(e) of the Texas Condominium Act, codified as Chapter 82

of the Texas Property Code, provides:

> Except as permitted or required by this chapter, an amendment may not create or increase special declarant rights, increase the number of units, change the boundaries of a unit, alter or destroy a unit or limited common element, change a unit's allocated interest, or change the use restriction on a unit unless the amendment is approved by 100 percent of the votes in the association.

The court finds that LMP's actions in removing paved areas of the parking lot violated §§ 5.11 and 6.2(b) of the Declaration and § 82.067(e) the Texas Condominium Act, and also constituted a trespass and breach of contract.  LMP's actions also constituted tortious interference with Canada's potential business relations–i.e., interference with his leasing of his property.

The court also finds that LMP's actions were a proximate cause of damages to Canada in the form of lost rents.  The evidence showed that Canada bought his property on May 19, 2003, and it remained vacant until June of 2005.  He bought it with the intent to have his wholly-owned company, On Site Computer Solutions, Inc. ("On Site"), lease half of the building at $10,600 per month plus its share of utilities and insurance, which it did beginning in June of 2005.  Canada's lease price was set with On Site when he bought the building in 2003, however, long before LMP's actions with respect to the parking lot.

Canada never listed his property with a broker for sale or for lease.  On July 15, 2006, however, he did lease the other half of his building directly to Medicus Insurance Company Medicus") for $5000 per month plus a prorated share of utilities but not taxes.  Under the terms of that lease, Medicus can terminate it without further liability merely by giving 60 days notice.

Canada claims that, as a result of LMP's actions, he lost rent from June of 2005 (the date of the trespass by LMP), to the date of trial (May 1, 2007).  He contended at trial that his losses total $177,600.00.

During the period from June of 2005 until July 15, 2006, Canada talked to several people about possibly leasing the vacant half of his building; however, never during that period did he list it with any commercial listing service or real estate agent as being for lease or otherwise, nor did he post any "for lease" sign on the property.  Accordingly, the court finds that Canada did not present sufficient, credible proof that he ever made any substantial attempt to rent the other

vacant part of his property until July 15, 2006.  Therefore, any damages he allegedly incurred prior to that date should be denied, for his failure to prove Plaintiff's actions were the cause of damages to him, or alternatively for his failure to prove that he properly mitigated his damages. *See e.g.,* **Walker v. Salt Flat Water Co.**, 96 S.W.2d 231, 232 (Tex. 1936) ("Where a party is entitled to the benefits of a contract and can save himself from damages resulting from its breach at a trifling expense or with reasonable exertions, it is his duty to incur such expense and make such exertions; and in such instances he can only charge the party in default with such damages as he could not have prevented with reasonable exertions and expense . . ..").

It does appear that the difference between the lease price to On Site of $10,600 per month and the July 15, 2006, lease price to Medicus of $5000 per month was due to the actions of LMP in June of 2005.  Canada therefore proved that the damages he suffered as lost rent totaled $53,200 (nine and a half months, from July 15, 2006, to April 30, 2007, at $5600 per month).

Based on the foregoing, the court finds that Canada should recover damages of $53,200 from LMP based on his causes of action relating to the parking lot destruction.  While Canada also seeks exemplary damages from LMP, the court finds that he failed to present credible proof to support such an award.

## LMP'S CLAIM FOR EQUITABLE SUBORDINATION

LMP also sought to equitably subordinate, under 11 U.S.C. § 510, certain of the Defendants' claims including the Association's special assessment and associated lien, and the Individual Defendants' claims for destruction of the parking lot.

"[T]hree conditions must be satisfied before exercise of the power of equitable subordination is appropriate[:] (i) The claimant must have engaged in some type of inequitable conduct . . . (ii) The misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant . . . [and] (iii) Equitable subordination of the claim

must not be inconsistent with the provisions of the Bankruptcy Act." **In re Mobile Steel Co.**, 563 F.2d 692, 699-700 (5th Cir. 1977).

The court finds that LMP failed to present sufficient, credible evidence that the claims of the Defendants should be equitably subordinated.

## ATTORNEYS FEES AND COSTS

Both the Association and the Individual Defendants have filed motions requesting that the court order that some or all of their attorneys fees and costs in this suit and in LMP's bankruptcy case be paid by LMP. LMP has not requested that it be awarded its attorneys fees and/or costs in this action and, because it was not the prevailing party, it is not entitled to recover any.

Specifically, the Defendants request the following in fees and expenses incurred:[6]

| Party | Firm | Role | Fees | Expenses | Total |
|---|---|---|---|---|---|
| Association | George & Brothers, L.L.P. | litigation counsel in this suit both in state court and bankruptcy court | $121,477.40 | $16,828.00 | $139,305.40 |
| Individual Defendants | Keister, Lockwood & Babb, L.L.P. | litigation counsel in this adversary | $149,852.50 | $5,081.27 | $154,933.77 |
| | SettlePou | advice on condominium law | $2,700.15 | $0.00 | $2,700.15 |

---

[6] The affidavits filed in support of the Association's and the Individual Defendants' motions requesting recovery of their attorneys fees and costs include testimony regarding what those fees and expenses would be in the event there are any appeals by Plaintiff in this case and the Defendants are successful in defeating such appeal. Specifically, Mr. Brothers and Mr. Lockwood each state in his respective affivadit that reasonable fees for his client(s) would be: $15,000 for an appeal to the U.S. District Court, $50,000 for an appeal to the Fifth Circuit Court of Appeals, and $75,000 for an appeal to the U.S. Supreme Court.

However, none of the Defendants make any such request in the motion itself. The court therefore declines to award any such fees and expenses.

In the alternative, the court would find that reasonable fees for the Defendants' successful defense of any appeals by Plaintiff are limited to: $15,000 for defense of an appeal by the Plaintiff to the U.S. District Court, $15,000 for an appeal by the Plaintiff to the Fifth Circuit Court of Appeals, and $10,000 for an appeal by the Plaintiff to the U.S. Supreme Court.

| Party | Firm | Role | Fees | Expenses | Total |
|-------|------|------|------|----------|-------|
|  | Burns Anderson Jury & Brenner, L.L.P. | litigation counsel in this suit while in state court | $15,562.50 | $2,644.00 | $18,206.50 |
|  | Hohmann, Taube & Summers L.L.P. | bankruptcy counsel in LMP's bankruptcy case and bankruptcy advice in this suit | $87,667.50 | $3,598.51 | $91,266.01 |

The legal issues raised by the Defendants' requests will be discussed first, after which the court will address the issue of the reasonableness of any fees and expenses for which a legal basis for recovery exists.

### The Association's Attorneys Fees and Costs: George & Brothers Law Firm

The Association claims a total of $139,305.40 in attorneys fees and expenses paid or owing to the law firm of George & Brothers, L.L.P., for defending this suit from and after September 22, 2006, and asserts that that portion of its attorneys fees and expenses are recoverable from LMP under Fed.R.Bankr.P. 7068, incorporating Fed.R.Civ.P. 68.[7]

Fed.R.Civ.P. 68 provides, in pertinent part:

> **Offer of Judgment.**  At any time more than 10 days before the trial begins, a party defending against a claim may serve upon the adverse party an offer to allow judgment to be taken against the defending party for the money or property or to the effect specified in the offer, with costs then accrued. . . .  If the judgment finally obtained by the offeree is not more favorable than the offer, the offeree must pay the costs incurred after the making of the offer. . . .

There is no dispute that a valid Offer of Judgment under FRCP 68 was served on LMP by all the Defendants on September 22, 2006.  D-POA Exh. 156, Offer of Judgment.  Specifically,

---

[7] As discussed above, the Association made a Special Assessment for $100,000 for its attorneys fees owed to George & Brothers in connection with this litigation, and assert a lien against LMP's interest in the Property in the proportionate amount of $52,000 . Plaintiff's Exh. 98, Notice of Special Assessment; Plaintiff's Exh. 1, the Declaration, § 4.7, Assessment Lien and Foreclosure.  The court has found that the assessment and the lien are valid.  Therefore, the amounts requested by the Association as discussed above, are partially secured by its lien.

the Defendants jointly offered $225,000.00, plus a resolution of the parking issues that involved

acceptance and implementation of the 2001 SDD with costs of construction to be capped at

$15,000 and to be paid by each unit owner proportional to that owner's interest, plus the

Association's release of its lien and the claim for the Special Assessment for attorneys fees

described above. It is also not disputed that LMP did not accept this offer.

The Association argues that because the total damages that LMP proved that it suffered

(i.e., $0.00) was less than the amount offered by the Defendants in their Offer of Judgment, so

that the judgment to be obtained by LMP will be less favorable than the Offer, the Association is

entitled under Fed.R.Civ.P. 68 to have its costs incurred from September 22, 2006, forward, paid

by LMP. It further argues that "costs incurred" should be construed in this case to include its

attorneys fees as well as its expenses of litigation.

In support of this argument, the Association cites **Marek v. Chesny**, 473 U.S. 1 (1985), in

which the Supreme Court held that, if a prevailing plaintiff's judgment does not exceed the

amount of the defendant's Rule 68 offer, then the post-offer costs that the Rule says the plaintiff

is no longer entitled to recover from defendant, include the plaintiff's attorneys fees so long as the

underlying substantive statute (that ordinarily would entitle the prevailing plaintiff to recover

costs from a losing defendant) includes fees as part of recoverable costs.

The facts of **Marek** therefore distinguish it from this case. **Marek** involved, and strictly

read only applies to, a *prevailing* plaintiff. *See* Fed.R.Civ.P. 68 (applicable to a "judgment finally

obtained by the offeree"–i.e., the party "adverse" to "the party defending against a claim"). Here,

LMP has not asserted that it prevailed or that the Defendants did not. Rather, the court expressly

finds that the Defendants, and not LMP, prevailed.

It has been held that Rule 68 "is entirely inapplicable, however, if the defendant, rather

than the plaintiff, obtains judgment." Wright, A.W. & Miller, A.R., 12 **Federal Practice &**

**Procedure** § 3006 (2007), citing **In Delta Air Lines, Inc. v. August**, 450 U.S. 346 (1981) (holding that Rule does not apply when plaintiff loses, noting that Rule 68's words "judgment … obtained by the offeree" "would not normally be read by a lawyer to describe a judgment in favor of the other party"); *accord,* **Louisiana Power & Light Co. v. Kellstrom**, 50 F.3d 319 (5th Cir. 1995) (Rule 68 is inapplicable with regard to a prevailing defendant even though plaintiff prevailed against other defendants); **Allen v. U.S. Steel Corp.**, 665 F.2d 689 (5th Cir. 1982) (defendant could not rely on Rule 68 to justify recovering its costs where judgment was entered in favor of defendant rather than plaintiffs); **Ezelle v. Bauer Corp.**, 154 F.R.D. 149 (D. Miss. 1994) (Rule 68 pertains only to judgments obtained by plaintiff and is inapplicable to cases in which defendant obtains judgment, or where plaintiff takes nothing). The Supreme Court in **Delta Air Lines** rejected the argument that it was inconsistent to hold that Rule 68 does not apply when a plaintiff loses, but does apply when a plaintiff recovers even a nominal amount:

> Our interpretation of the Rule is consistent with its purpose. The purpose of Rule 68 is to encourage the settlement of litigation. In all litigation, the adverse consequences of potential defeat provide both parties with an incentive to settle in advance of trial. Rule 68 provides an additional inducement to settle in those cases in which there is a strong probability that the plaintiff will obtain a judgment but the amount of recovery is uncertain. Because prevailing plaintiffs presumptively will obtain costs under Rule 54(d), Rule 68 imposes a special burden on the plaintiff to whom a formal settlement offer is made. If a plaintiff rejects a Rule 68 settlement offer, he will lose some of the benefits of victory if his recovery is less than the offer.FN9 Because costs are usually assessed against the losing party, liability for costs is a normal incident of defeat. Therefore, a nonsettling plaintiff does not run the risk of suffering additional burdens that do not ordinarily attend a defeat, and Rule 68 would provide little, if any, additional incentive if it were applied when the plaintiff loses.

**Delta Air Lines,** 450 U.S. at 352 (footnote omitted). In other words, the Supreme Court "reasoned that [the] defendant's interpretation [that Rule 68 should also apply when defendants prevail] would not promote the rule's purposes because it would not prompt defendants to make reasonable offers, and that the history of the rule suggested that it was not intended to visit adverse consequences on a plaintiff unless the plaintiff rejected an offer that would be reasonable

assuming plaintiff prevailed."    Wright, A.W. & Miller, A.R., 12 **Federal Practice & Procedure**
§ 3006 at fn.3 (2007), discussing **Delta Air Lines,** 450 U.S. at 351 (per Stevens, J.).

It is true in this case that after LMP filed its suit, the Defendants took action to rescind the
2nd Third Amendment, part of the relief requested by LMP.  In addition, LMP obtained a
summary judgment, pre-trial, finding the Defendants liable for violation of the Texas
Condominium Act for their adoption of the invalid 2nd Third Amendment.  The court in that
summary judgment reserved the question of damages from that violation for trial, and the Plaintiff
ultimately failed to prove with sufficient certainty what damages it may have sustained.  The
judgment that the court will enter in this case will therefore provide no recovery on any of the
Plaintiff's causes of action.  "It has been held that because the rule is worded as it is the
comparison can only be made to the provisions of the court's judgment, and other consequences
of the suit are irrelevant." Wright, A.W. & Miller, A.R., 12 **Federal Practice & Procedure** §
3006.1 (2007), citing **Spencer v. General Electric Co.**, 894 F.2d 651 (4th Cir. 1990) (although
plaintiff's suit led to the adoption of an anti-harassment policy by defendant, that policy was not
properly considered under Rule 68 in comparing the judgment ultimately obtained and
defendant's pretrial offer of judgment); *see also* **Johnston v. Penrod Drilling Co.**, 803 F.2d 867,
870 (5th Cir. 1986) ("Rule 68's description of the sum to be compared to the offer is clear: 'the
judgment finally obtained.'  This explicit language is not subject to an interpretation that would
allow this sum to be increased to include amounts received by plaintiff in settlement.").

Based on all the foregoing, the court holds that the Defendants are the prevailing parties in
this action and that Rule 68 therefore does not apply.[8]

---

[8] Even if Rule 68 were applicable in this case, the court would find that, in accordance
with **Marek**, "costs incurred" under the Rule should be construed in this case to allow recovery
only of the Defendants' costs, and not their attorneys fees.
    As discussed above, only if the underlying statute authorizing recovery of "costs"
includes attorneys fees in those costs, are they recoverable under Rule 68.  In this case, the

However, while the Association in its Motion for Recovery of Attorneys Fees relies entirely on its Offer of Judgment and Rule 68 as the basis for its recovery of costs and attorneys fees (and so limits the amount of its request and proof to those incurred after the Offer of Judgment), in its Reply to the Plaintiff's Response to that Motion the Association points out that under Tex. Prop. Code § 82.161 any "prevailing party . . . is entitled to reasonable attorney's fees and costs of litigation from the nonprevailing party." The court has found that the Defendants were the prevailing parties in this action.[9] It also finds this suit to have been one "to enforce the declaration, bylaws, or rules" of the Association, in that the Plaintiff's claims and the Individual Defendants' counterclaims were centered around violations of the Declaration (the notice and

---

Association argues that the relevant underlying statute is § 82.161 of the Texas Property Code (i.e., of the Texas Condominium Act), which provides:

### § 82.161. Effect of Violations on Rights of Action and Attorney's Fees

* * *

(b) The prevailing party in an action to enforce the declaration, bylaws, or rules is entitled to reasonable attorney's fees *and costs* of litigation from the nonprevailing party.

(Emphasis added.) In light the italicized language, the court finds that this statute can not be read to include attorneys fees *as part of* costs that are recoverable. *See* **Eagle Point Condominium Owners Association v. Coy**, 9 P.3d 898, 905 (Wash. App. Div. 1 2000) (interpreting Washington state's offer of judgment rule, which is substantially the same as Rule 68, and its Condominium Act, which provides that "[t]he court, in an appropriate case, may award reasonable attorney's fees to the prevailing party," and finding that, under its language, "[t]he condominium statute does not define attorneys fees as costs").

Based on the foregoing, the court holds that the Association is not entitled to any of its costs under Fed.R.Civ.P. 68, and that even if it were, such "costs" would not include the Association's attorneys fees.

[9] While no authority could be found expressly holding that § 82.161 applies to prevailing defendants as well as plaintiffs, *see* **Dilston House Condominium Ass'n v. White**, _____ S.W.3d _____, 2007 WL 1745274, *1 (Tex. App.–Houston [14 Dist], no writ) ("assum[ing], without deciding, that . . . a defending party may qualify as a prevailing party entitled to attorney's fees under section 82.161(b)"), the plain language of that provision as well as other jurisdictions' interpretation of the substantially similar Uniform Condominium Act provision on which is based, convinces the court that it applies in this case. *See* **Eagle Point Condominium Owners Ass'n v. Coy**, 102 Wash. App. 697, 713, 9 P.3d 898, 907 (Wash. App. Div. 1 2000) ("under the Condominium Act either the plaintiff or the defendant may be the prevailing party and receive, in an appropriate case, an award of attorney fees").

voting requirements for amendment, the propriety of the special assessment, and the consent requirement for alteration of the parking lot).  Accordingly, notwithstanding this court's ruling that the Association is not entitled to any costs under Rule 68, the court holds that the Association *is* entitled to its attorneys fees as well as its "costs of litigation" directly under § 82.161.[10]

Even those expenses may be limited.  LMP argues that the Association, because it asserted no counterclaim in this suit, cannot rely on any underlying substantive statute to authorize costs beyond what are available on account of its Offer of Judgment and under Rule 68 and § 1920 and, therefore, the expert witness fees charged by the Association should be disallowed because not permitted under 28 U.S.C. § 1920.

The court has held that because the Defendants were the prevailing parties, Rule 68 does not apply in this case.  However, 28 U.S.C. § 1920 would nevertheless apply because, as prevailing parties, the Defendants are entitled to costs under Fed.R.Civ.P. 54(d)(1).  That Rule provides:

> **(d) Costs; Attorneys' Fees.**
> (1) Costs Other than Attorneys' Fees. Except when express provision therefor is made either in a statute of the United States or in these rules, costs other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs; but costs against the United States, its officers, and agencies shall be imposed only to the extent permitted by law. Such costs may be taxed by the clerk on one day's notice. On motion served within 5 days thereafter, the action of the clerk may be reviewed by the court.

Section 1920 lists costs that are recoverable under Rule 54(d)(1).  *See generally,* **Wells v. Dallas Independent School District**, 576 F.Supp. 497, 510 (N.D. Tex. 1983) (addressing one type of cost listed in § 1920 and noting that that statutory provision "must, however, be read in

---

[10] As mentioned above, the Association requested and provided proof only of those costs and attorneys fees incurred since September 22, 2006, the date of the Offer of Judgment. Therefore, even though § 82.161 would permit recovery of all of its attorneys fees and expenses, the court finds that the Association has waived any recovery for those incurred before September 22, 2006.

conjunction with Fed.R.Civ.P. 54(d) that costs should be allowed as of course to the prevailing party unless the court otherwise directs.").

It is well-established that expert witness fees are not listed as recoverable under § 1920. *E.g.,* **Crawford Fitting Co. v. J. T. Gibbons, Inc.**, 482 U.S. 437 (1987); *accord,* **Coats v. Penrod Drilling Corp.**, 5 F.3d 877, 891 (5th Cir. 1993) (fees and expenses incurred in connection with expert witnesses, in excess of the standard witness fee listed in § 1920(3) and fixed by 28 U.S.C. § 1821, are not within the scope of § 1920).

However, as discussed above, Tex. Civ. Prac. & Rem. § 82.161 (standing alone and not as the authorizing statute under Rule 68) may provide authority in this case for the allowance of costs in addition to those specified in § 1920. While the court has not been able to find, and the parties have not directed it to, any authority regarding which expenses in particular are recoverable as "costs of litigation" under § 82.161, the general rule under Texas law was stated by the court in **Westech Engineering, Inc. v. Clearwater Constructors, Inc., a Div. of Phelps, Inc.**, 835 S.W.2d 190, 206 (Tex. App.–Austin 1992, no writ):

> "Costs" generally do not include costs billed to the client as part of the attorney's fee for services provided. Rather, costs usually refer to "[f]ees and charges required by law to be paid to the courts or some of their officers, the amount of which is fixed by statute or the court's rules; e.g. filing and service fees." Black's Law Dictionary, p. 312 (5th ed. 1979).

This reasoning would lead one to conclude that "costs of litigation" as used in § 82.161 should be interpreted as limited to only those expenses that are allowed as costs of court under applicable rules. However, as the **Westech** court acknowledged, there is another category of expenses–those that are included "as part of the attorney's fee for services provided." Those other expenses may also be compensable, as part of a reasonable attorney's fee. In this case, the expert witness fee of which LMP complains is one such expense. The court finds that the fee in this case is allowable,

to the extent reasonable, as part of the Association's "reasonable attorneys fees" recoverable by it as the prevailing party pursuant to § 82.161.

Having determined that the Association's fees and expenses are allowable, the court reviews the amounts requested for reasonableness, as required by § 82.161.  George & Brothers seeks recovery of fees in the amount of $121,477, and expenses in the amount of $16,828, for a total of $139,305.40.  After careful review of its billing statements attached to the affidavit in support of its Motion for Recovery of Attorneys Fees, the court finds that all the fees and expenses requested are reasonable and should be allowed.

### The Individual Defendants' Attorneys Fees and Costs

The Individual Defendants seek awards of their attorneys fees and costs under various authority, including Fed.R.Civ.P. 68 and their Offer of Judgment, Tex. Prop. Code § 82.161, and Tex. Civ. Prac. & Rem. § 38.001.  In particular, they request the following fees and expenses be allowed, for a total awarded of $267,106.43.

| Firm | Role | Fees | Expenses | Total |
|------|------|------|----------|-------|
| Keister, Lockwood & Babb, L.L.P. | litigation counsel in this adversary | $149,852.50 | $5,081.27 | $154,933.77 |
| SettlePou | advice on condominium law | $2,700.15 | $0.00 | $2,700.15 |
| Burns Anderson Jury & Brenner, L.L.P. | litigation counsel in this suit while in state court | $15,562.50 | $2,644.00 | $18,206.50 |
| Hohmann, Taube & Summers L.L.P. | bankruptcy counsel in LMP's bankruptcy case and bankruptcy advice in this suit | $87,667.50 | $3,598.51 | $91,266.01 |

The Individual Defendants make the same argument as the Association with regard to their right to recover fees and expenses incurred after September 22, 2006, under the Offer of Judgment, Fed.R.Civ.P. 68, and either Tex. Prop. Code § 82.161 and/or Tex. Civ. Prac. & Rem.

§ 38.001.  For the reasons stated above in the discussion of the Association's argument, the court finds that Rule 68 does not apply in this case and therefore there should be no recovery under that Rule.[11]

However, even more so than the Association, the Individual Defendants need not rely solely on the Offer of Judgment and Rule 68, and in fact have not so limited their request for attorneys fees and expenses.  Rather, they argue that because they asserted counterclaims in the suit for breach of contract and for violations of the Texas Condominium Act and the Association's Declaration and bylaws, they are expressly entitled to recover all their fees and expenses under Tex. Prop. Code § 82.161 and/or Tex. Civ. Prac. & Rem. § 38.001.

For the reasons set out above with respect to the Association's request for fees, the court finds that because the Individual Defendants, along with the Association, were the prevailing parties in this litigation, their attorneys fees and costs are allowable directly under Tex. Prop. Code § 82.161, subject to the court's determination that they are reasonable.  In light of this holding the court finds it not necessary, and declines, to rule on the Individual Defendants' alternative request for allowance under Tex. Civ. Prac. & Rem. § 38.001.

Having found that the Individual Defendants have a right to recover their attorneys fees and expenses, the court turns now to the determination of the reasonableness of what they have requested be allowed.

---

[11] As with the Association's fees and expenses, the court would find alternatively that even if Rule 68 were applicable, the Individual Defendants' fees are not included as part of costs under § 82.161 and therefore are not recoverable under Rule 68 as construed in **Marek**.  Similarly, the court would also find that, as in § 82.161, attorneys fees are not included as part of costs under § 38.001 either, and therefore are not recoverable under Rule 68.  In particular, § 38.001 does not define "costs" to include attorneys fees, but rather allows fees only "in addition to" costs.  *See* **International Nickel Co., Inc. v. Trammel Crow Distribution Corp.**, 803 F.3d 150, 157 fn.2 (5th Cir. 1986) (noting that, under **Marek**, "costs incurred" in Rule 68 does not include attorneys fees because under § 38.001 they are awarded "in addition" to and not "as part of costs").

<u>The Keister Firm</u>

The law firm of Keister, Lockwood & Babb, LLP (the "Keister Firm") represented the Individual Defendants.  The Keister Firm seeks a total of $149,852.50 in fees, and $5,081.27 in expenses, for at total of $154,933.77.  Of that total amount of fees and expenses, $76,848.00 was incurred following the Defendants' Offer of Judgment on September 22, 2006.  In addition, the Keister Firm seeks fees for the following other law firms: Settle & Pou, $2,700; Burat, Anderson, Jewel & Brennan, LLP, $18,206.00 ($15,562.50 in fees plus $2,644 in expenses).  Those fee requests are discussed below.

After reviewing the time sheets submitted by the Keister Firm in support of their request, the court finds that the following charges listed on the Firm's invoices should not be allowed, because from the descriptions given the court is unable to discern what was reviewed and/or the relevancy of what was reviewed, what was researched and/or the amount of time it took, or what was specifically done and/or the amount of time it took, and the court therefore finds that the following charges should also be disallowed:

| Billing Page | Date(s) of Service | Amount Disallowed |
|---|---|---|
| 2 | 2/21/06 | $412.50 |
|   | 2/24/06 | $62.50 |
|   | 2/27/06 | $117.50 |
|   | 2/28/06 | $100.00 |
| 3 | 3/1/06 | $112.50 |
|   | 3/4/06 | $100.00 |
|   | 3/7/06 | $162.50 |
|   | 3/8/06 | $125.00 |
|   | 3/16/06 | $62.50 |

| Billing Page | Date(s) of Service | Amount Disallowed |
|---|---|---|
| 4 | 3/21/06 | $50.00 |
| | 3/22/06 | $650.00 |
| | 3/23/06 | $87.50 |
| | 3/28/06 | $562.50 |
| | 3/29/06 | $312.50 |
| 5 | 4/1/06 | $112.50 |
| | 4/5/06 | $87.50 |
| | | $627.50 |
| | 4/11/06 | $225.00 |
| 6 | 4/17/06 | $200.00 |
| | 4/18/06 | $112.50 |
| | 4/20/06 | $112.50 |
| | 4/27/06 | $112.50 |
| 7 | 5/9/06 | $812.50 |
| | 5/10/06 | $187.50 |
| | 5/11/06 | $125.00 |
| | 5/12/06 | $812.50 |
| 8 | 5/14/06 | $812.50 |
| | 5/15/06 | $187.50 |
| | 5/16/06 | $712.50 |
| | 5/22/06 | $812.50 |
| 9 | 5/23/06 | $962.50 |
| | 5/30/06 | $187.50 |
| 10 | 6/4/06 | $500.00 |
| | 6/7/06 | $687.50 |
| | 6/9/06 | $198.00 |
| | 6/10/06 | $247.50 |
| 11 | 6/13/06 | $500.00 |

| Billing Page | Date(s) of Service | Amount Disallowed |
|---|---|---|
| 12 | 6/15/06 | $612.50 |
|  | 6/16/06 | $400.00 |
|  | 6/20/06 | $162.50 |
|  | 6/21/06 | $500.00 |
| 13 | 6/25/06 | $187.50 |
| 14 | 7/5/06 | $287.50 |
| 15 | 7/19/06 | $737.50 |
| 16 | 7/22/06 | $625.00 |
|  | 7/23/06 | $475.00 |
| 18 | 7/30/06 | $212.50 |
|  | 7/31/06 | $525.00 |
|  | 8/3/06 | $412.50 |
| 20 | 8/9/06 | $825.00 |
| 21 | 8/10/06 | $637.50 |
|  | 8/12/06 | $225.00 |
|  | 8/13/06 | $662.50 |
| 22 | 8/14/06 | $487.50 |
| 23 | 8/18/06 | $312.50 |
|  | 8/19/06 | $687.50 |
| 24 | 8/22/06 | $1187.50 |
|  | 8/25/06 | $1250.00 |
| 25 | 8/26/06 | $68.75 |
|  |  | $214.50 |
|  | 8/28/06 | $330.00 |
|  | 8/29/06 | $475.00 |
| 26 | 8/30/06 | $330.00 |
| 28 | 9/13/06 | $812.50 |
| 32 | 10/9/06 | $787.50 |

| Billing Page | Date(s) of Service | Amount Disallowed |
|---|---|---|
| | 10/10/06 | $687.50 |
| 34 | 10/26/06 | $112.50 |
| 35 | 11/6/06 | $62.50 |
| | 11/14/06 | $75.00 |
| 43 | 2/19/07 | $212.50 |
| 45 | 3/16/07 | $275.00 |
| 46 | 3/22/07 | $575.00 |
| | 3/26/07 | $637.50 |
| 48 | 4/1/07 | $900.00 |
| | 4/2/07 | $1037.00 |
| | 4/4/07 | $437.50 |
| 49 | 4/6/07 | $312.50 |
| | 4/8/07 | $812.50 |
| 51 | 4/17/07 | $725.00 |
| | 4/19/07 | $937.50 |
| | 4/22/07 | $325.00 |
| 52 | 4/26/07 | $1500.00 |
| | 4/27/07 | $1500.00 |
| | | $115.50 |

Based on the foregoing, the court finds that the total amount of the Keister Firm's fees that should be disallowed is $37,923.75. Therefore, of the total $154,933.77 requested, $111,928.75 in fees and $5,081.27 in expenses, for a total of $117,010.02, are allowed.

## SettlePou

The Individual Defendants also seek recovery of attorneys fees for the firm of SettlePou in the total amount of $2,700.15. Unlike the work done by the Keister Firm, the area of expertise of the SettlePou attorney who performed the services, and the area in which she advised the

Individual Defendants (condominium law), is relatively clear from the descriptions of what she did and from her testimony, and its relevance to this litigation is also apparent.  Accordingly, and because the court finds that the amount of SettlePou's fees are comparatively *de minimus,* the court finds that they should be allowed in full.

### The Burns Firm

The Individual Defendants also seek recovery of their attorneys fees charged by Jeff Jury of the law firm of Burns, Anderson, Jury & Brenner, L.L.P., in the amount of $15,562.50, plus expenses of $2,644.00, for a total of $18,206.50.  After review of the billing statements, the court finds that $351.00 of that amount should be disallowed because, in the following entries, the court is unable to discern what was reviewed and/or the relevance, and/or what specifically was done and the time it took to do it:

| Billing Page | Date(s) of Service | Amount Disallowed |
|---|---|---|
|  | 11/5/05 | $157.50 |
|  | 11/16/05 | $60.00 |
|  | 1/23/06 | $22.50 |
|  | 1/25/06 | $22.50 |
|  | 1/27/06 | $90.00 |

The total amount allowed for the Burns Firm's fees and expenses, therefore, is $17,855.50.

### Hohmann Taube

The Individual Defendants also seek recovery for the fees and expenses charged by the law firm of Hohmann, Taube & Summers, LLP ("Hohmann Taube"), in the amount of $87,667.50 in fees and $3,598.51 in expenses, for a total amount of $91,266.01.

The court notes that the stated intended recipient of the Hohmann Taube firm's invoices was:

Tom McKay
8500 Shoal Creek Owners Association, Inc.

without any mention of McCarley and Canada, such that McKay appears to be named only as the Association's representative.  However, in attorney Mark Taylor's Affidavit attached to the Individual Defendants' Motion for Recovery of Attorneys Fees, he swore that his firm represented "8500 Shoal Creek Owners Association, Inc, and members of its Board, Chris Canada, Lloyd McCarley, and Tom McKay."  Inasmuch as the Plaintiff has not challenged whether Hohmann Taube in fact represented each and every one of the Individual Defendants, the court accepts Mr. Taylor's undisputed testimony on the issue.

By far the largest issue presented by Hohmann Taube's billing statements is whether its services are properly allocable to this adversary proceeding, or relate instead to representation of the Individual Defendants in LMP's bankruptcy case.   On page 4 of the Individual Defendants' Motion for Recovery of Attorneys Fees, they state that Hohmann Taube was retained "for representation in connection with the bankruptcy aspect of this case."  As discussed above, the Individual Defendants' entitlement to the recovery of their attorneys fees and costs arises under § 82.161 of the Texas Condominium Act), which provides:

### § 82.161. Effect of Violations on Rights of Action and Attorney's Fees

*  *  *

(b) The prevailing party in an action to enforce the declaration, bylaws, or rules is entitled to reasonable attorney's fees *and costs* of litigation from the nonprevailing party.

According to this language, fees and costs are permitted only to a party who prevails in "an action to enforce the declaration, bylaws or rules" of a condominium association; therefore, the court finds that the fees and costs that are allowed are limited to those incurred in actually prevailing in *that* action.  In other words, in this instance, the fees and costs that the Individual Defendants may

recover are limited to those incurred in the action in which they were the prevailing party–i.e., only in connection with this adversary proceeding, not in representing them in the Plaintiff's bankruptcy case in general.  There has been no adjudication that the Individual Defendants have prevailed in the Plaintiff's bankruptcy case, except to the extent that litigation in the bankruptcy case concerned the Individual Defendants' proof of claim.  To that extent, the court is of the opinion that such litigation is synonymous with litigation of this adversary proceeding and therefore fees and costs incurred in litigating over allowance of the proof of claim are allowable.

In addition, from a review of Hohmann Taube's invoices it also appears that there is some duplication between its work and that of the Keister Firm.  Like that firm, Hohmann Taube's invoices also reflect extensive charges for research where the subject matter has been redacted.  When billing rates are in the range of $300 to $400 per hour, the court assumes that the billing attorney would not have to do as much research as an associate with a lower rate.  Generally, without disclosure of the subject matter of the research, or unless the subject matter is discernible in context, the court is unable to find that the specific charge is reasonable and therefore allowable.  Moreover, as in some of the other fee applications it appears that Hohmann Taube was overly concerned that the descriptions it provided of its services would be considered a basis for waiver of the Individual Defendants' attorney client privilege.

Considering all of the above, the billing statements of Hohmann Taube show over 90 entries, or $25,650.10 of the $87,667.50 sought as fees, that are either: (1) related to representation of the Individual Defendants on matters in the bankruptcy case rather than work on this lawsuit or to their proof of claim, or (2) described with such lack of detail that the court is unable to determine that they are related to work on this adversary proceeding or the claim in the bankruptcy case, rather than to the work on other issues related solely to the bankruptcy case:

| Date(s) of Service | Total Amount Charged | Amount Related to Bankruptcy Case Issues |
|---|---|---|
| 3/28/06 | $375 | $175 |
| 3/30/06 | $300 | $175 |
| 3/31/06 | $300 | $175 |
| 4/3/06 | $300 | $175 |
| 4/18/06 | $300 | $300 |
| 4/19/06 | $300 | $300 |
| 4/21/06 | $200 | $200 |
| 4/26/06 | $200 | $200 |
| | $325 | $325 |
| 5/1/06 | $300 | $300 |
| 5/8/06 | $300 | $300 |
| 5/9/06 | $375 | $375 |
| 5 /10/06 | $75 | $75 |
| 5/25/06 | $375 | $375 |
| 5/26/06 | $375 | $375 |
| 5/31/06 | $375 | $715 |
| | $340 | |
| 6/1/06 | $900 | $1240 |
| | $340 | |
| 6/2/06 | $450 | $450 |
| 6/6/06 | $300 | $300 |
| | $900 | $900 |
| 6/8/06 | $450 | $450 |
| 6/12/06 | $100 | $100 |
| | $150 | $150 |
| 6/13/06 | $100 | $100 |

| Date(s) of Service | Total Amount Charged | Amount Related to Bankruptcy Case Issues |
|---|---|---|
|  | $300 | $300 |
| 6/16/06 | $200 | $200 |
| 6/19/06 | $450 | $450 |
| 6/21/06 | $375 | $375 |
| 6/22/06 | $750 | $750 |
| 6/29/06 | $150 | 150 |
| 7/12/06 | $525 | $525 |
| 7/13/06 | $375 | $375 |
| 7/24/06 | $750 | $300 |
| 7/25/06 | $300 | $300 |
| 7/26/06 | $150 | $150 |
| 7/27/06 | $225 | $225 |
| 7/28/06 | $375 | $200 |
| 7/30/06 | $300 | $300 |
| 8/3/06 | $300 | $300 |
| 8/4/06 | $1275 | $1275 |
| 8/7/06 | $225 | $225 |
| 8/8/06 | $150 | $150 |
| 8/9/06 | $450 | $450 |
|  | $56.25 | $56.25 |
| 8/11/06 | $200 | $200 |
| 8/14/06 | $100 | $100 |
| 8/16/06 | $300 | $300 |
| 8/18/06 | $450 | $450 |
| 8/22/06 | $225 | $225 |
| 8/23/06 | $675 | $675 |

| Date(s) of Service | Total Amount Charged | Amount Related to Bankruptcy Case Issues |
|---|---|---|
| 8/24/06 | $600 | $600 |
| 8/25/06 | $450 | $450 |
| 9/1/06 | $150 | $150 |
| 9/5/06 | $150 | $150 |
| 9/18/06 | $450 | $450 |
| 9/28/06 | $600 | $600 |
| 10/3/06 | $300 | $300 |
| | $675 | $675 |
| 10/4/06 | $900 | $300 |
| | $975 | $975 |
| 10/5/06 | $200 | $200 |
| | $375 | $375 |
| 10/10/06 | $150 | $150 |
| 10/13/06 | $375 | $375 |
| 10/16/06 | $450 | $450 |
| 10/17/06 | $1200 | $1200 |
| 10/18/06 | $2000 | $2000 |
| 11/3/06 | $225 | $225 |
| 11/6/06 | $150 | $150 |
| 11/8/06 | $18.75 | $18.75 |
| 11/14/06 | $150 | $150 |
| | $150 | $150 |
| 11/22/06 | $75 | $75 |
| 11/28/06 | $100 | $100 |
| 1/15/07 | $212.50 | $212.50 |
| | $650 | $650 |

| Date(s) of Service | Total Amount Charged | Amount Related to Bankruptcy Case Issues |
|---|---|---|
| 1/16/07 | $318.75 | $318.75 |
| 1/17/07 | $637.50 | $637.50 |
|  | $81.25 | $81.25 |
| 1/18/07 | $318.75 | $318.75 |
|  | $162.50 | $162.50 |
| 1/31/07 | $81.25 | $81.35 |
| 2/23/07 | $487.50 | $487.50 |
| 3/22/07 | $162.50 | $162.50 |
| 4/11/07 | $162.50 | $162.50 |
| 4/20/07 | $162.50 | $162.50 |
| 4/21/07 | $325 | $325 |
| 4/25/07 | $162.50 | $162.50 |

The court therefore finds that a total of $25,650.10 in fees should be disallowed as not relating to this adversary proceeding or the Individual Defendants' proof of claim. Of the $87,667.50 requested as fees, therefore, $62,017.40 and expenses of $3,598.51 should be allowed, for a total allowed amount of $65,615.91.

## **CONCLUSION**

In accordance with the foregoing, a Judgment shall be entered.

#   #   #